**8IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MARK MCDONALD, NANETTE MCDONALD, and MADELEINE MCDONALD,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 3:25-cv-01301** |
| | ) | **Judge Aleta A. Trauger** |
| **CITY OF OAK HILL,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

The plaintiffs bring suit against the City of Oak Hill for an allegedly unlawful taking in violation of the Fifth and Fourteenth Amendments and in violation of state law. Now before the court are the City's Motion for Judgment on the Pleadings (Doc. No. 13) and Supplemental Motion for Judgment on the Pleadings (Doc. No. 39) and the plaintiffs' Revised Motion for Partial Judgment on the Pleadings (Doc. No. 35).

For the reasons set forth herein, defendant's initial motion will be granted; its supplemental motion will be denied as moot; and the plaintiffs' motion will be denied.

## I. LEGAL STANDARD – RULE 12(c)

Under Federal Rule of Civil Procedure 12(c), any party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion is essentially a delayed motion to dismiss under Rule 12(b)(6) and is evaluated under the same standards. *See Anders v. Cuevas*, 984 F.3d 1166, 1174 (6th Cir. 2021). Thus, judgment on the pleadings is proper "when no material issue of fact exists and the party

making the motion is entitled to judgment as a matter of law." *Id.* (quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991)).

In reviewing a Rule 12(c) motion, the court must construe the complaint in the light most favorable to the nonmoving party, accept the well-pleaded factual allegations as true, and determine whether the complaint contains enough facts to make the legal claims facially plausible. *Id.* (citations omitted). To state a plausible claim, the complaint must contain "direct or inferential allegations respecting all the material elements under some viable legal theory." *Id.* (quoting *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007)).

Generally, if "matters outside the pleadings are presented to and not excluded by the court," a motion to dismiss under Rule 12(b)(6) or 12(c) "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). At the same time, however, it has long been the rule that a court may consider not only the complaint and exhibits attached to it, but also exhibits attached to a motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted). A court may also consider public records without converting a motion to dismiss into a motion for summary judgment. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (citation omitted).

## II. FACTS AND PROCEDURAL HISTORY

Plaintiffs Mark McDonald and Nanette McDonald own real property (the "Property" or the "plaintiffs' Property") situated in Davidson County, Tennessee, within the municipal boundaries of the City of Oak Hill (the "City"). Their daughter, plaintiff Madeleine McDoncald, is the resident tenant of the Property. (Compl. ¶¶ 1–3, 6.) The house on the Property was built in 1965. (*Id.* ¶ 12.) The real property next door to the plaintiffs' Property was owned at all relevant times by Mary Rust ("Rust's property") and is also situated within the City. (*Id.* ¶¶ 8–9.) (The two parcels are

collectively referred to herein as the "Properties"). The house on Rust's property was built in the 1950s. (*Id.* ¶ 12.)

The two Properties share a common driveway, and the owners of the two Properties have both used the shared driveway since the houses were built on the respective Properties. (*Id.* ¶ 13.) The plaintiffs allege, and it is now undisputed for purposes of the parties' respective motions, that the shared driveway is subject to a reciprocal easement (the "driveway easement")—the plaintiffs have an easement on that portion of the driveway that lies on Rust's property and Rust has an easement on that portion of the driveway on the plaintiffs' Property. The Complaint further alleges that the reciprocal easements "run[] with the land," so that subsequent purchasers are bound by them. (*Id.* ¶ 20.) According to the plaintiffs, Rust was at all times fully aware of the existence of the driveway easement and informed the plaintiffs of it when they purchased the Property. (*Id.* ¶ 28.)

Rust subsequently learned that, because of "lot-size-calculation procedures" observed by the City, which exclude from such calculations land subject to an easement, she would be unable to make certain improvements on her property as long as the driveway easement was in place. (*Id.* ¶ 29.) She asked the McDonalds to sign an agreement dissolving the easement, but they declined. (*Id.* ¶¶ 30–31.)

In July 2024, Rust asked the City about building a fence along the property line, down the middle of the driveway. (*Id.* ¶ 32.) She was informed by a City code enforcement officer, Stephen Snow, that building a fence required a building permit from the City. Pursuant to the City's Zoning Ordinance, among the documents Rust would be required to submit, along with her application for a building permit, was a site plan showing the "actual shape, location, and dimensions of the lot, any easements, all setback lines, and the building envelope." City of Oak Hill Zoning Ordinance

§ 14-152(a).[1] The plaintiffs allege that the City also required Rust to submit a "stamped survey showing property lines and easements." (Compl. ¶ 34.)

Initially, Snow told Rust that, if the portion of the driveway on her property was encumbered by an easement, she could not obtain a permit to build the fence down the center of the driveway. (*Id.* ¶ 35.) In approximately early November 2024, Rust apparently submitted to the City a Deed of Correction, signed by the couple from whom Rust had purchased her property in 2019, that purported to refute the existence of the driveway easement, stating that the "Joint Driveway Agreement" executed between the owners of record in 1992 and recorded at the Davidson County Register's Office was not an easement and was not intended to run with the land. (Oct. 29, 2024 Deed of Correction, Doc. No. 1-3.) Rust reported to Snow that a Deed of Correction had been recorded that "remove[d] references to the easement from her deed" and "had the effect of terminating the easement" benefiting the plaintiffs' Property. (Compl. ¶ 36.) According to the plaintiffs, Snow "sent the Deed of Correction to the City Attorney, who concluded that the Deed of Correction sufficed to remove any easement," but the City "was aware that Plaintiffs insisted on the legitimacy of the easement." (*Id.* ¶¶ 84–85.) Despite knowledge of this dispute, the City approved Rust's building permit application and, on November 21, 2024, granted her a permit to construct a fence down the driveway. (*Id.* ¶ 86.) Rust constructed the fence, making it impossible for the plaintiffs to use the easement. (*Id.* ¶ 87.)

The plaintiffs assert that the easement benefiting the plaintiffs' Property could only have been terminated with the plaintiffs' consent and that the City was incorrect in "agreeing" with Rust that the Deed of Correction terminated the easement. (*Id.* ¶¶ 39–40.) The Complaint goes on at

---

[1] Available at: https://library.municode.com/tn/oak_hill/codes/code_of_ordinances?nodeId=CH14ZOLAUSCO_PT1ZOOR_S14-152REPLBUPE

great length to explain why, as a matter of Tennessee law, Rust's procurement and recording of the Deed of Correction did not, and could not as a matter of law, terminate the easement benefiting the plaintiffs' Property; why prior usage created a prescriptive easement; and why the 1992 Agreement created an "express easement appurtenant." (*Id.* ¶¶ 41–75.)

On December 6, 2024, the plaintiffs filed suit against Rust in the Davidson County Chancery Court, seeking a declaratory judgment to quiet title and enforce the driveway easement and damages arising from defamation of title, interference with easement, and trespass. (Doc. No. 17-1.)[2]

Meanwhile, the plaintiffs also appealed the issuance of the permit to the Board of Zoning Appeals ("BZA"), but the BZA, as a matter of policy, "decline[s] to make determinations concerning the existence of property rights adversely affected by permits" and lacks the "training or expertise in the relevant facets of Tennessee property law to make an intelligent or informed review" of private property disputes. (*Id.* ¶¶ 94–95.) "When called upon to review the permit issued in this case, the [BZA's] members . . . opined that the Board lacked the power to resolve disputes over citizens' property rights." (*Id.* ¶ 96.) The Complaint acknowledges that "the Board did not formally affirm the permit" and instead "held the Plaintiffs' appeal from the permit's issuance in abeyance." (*Id.* ¶ 141.) At the same time, however, the BZA's "members made clear that, had the matter been put to a final vote, they would have affirmed the permit," and the City Attorney

[2] In June 2025, the plaintiffs filed a Motion for Partial Judgment on the Pleadings in the state case, seeking a ruling "establishing the validity of the easement described in the Complaint." (Doc. No. 17-4 at 1.) The Chancery Court denied the motion. (Doc. No. 17-5.) However, the plaintiffs and Rust entered an Agreed Order in September 2025 granting judgment for the plaintiffs on Count 1, which had the effect of quieting title, nullifying the Deed of Correction, affirmatively declaring the validity of the easement, and requiring Rust to remove the fence. (Doc. No. 17-3; *see also* Compl. ¶¶ 104–05.) In June 2026, the parties settled the plaintiffs' damages claims and entered an Agreed Final Order. (Doc. No. 38-1.)

"subsequently informed the Plaintiffs that the Board would, in fact, have affirmed the permit on a final vote."[3] (*Id.*)

Shortly after entering into the Agreed Order quieting title and effectively resolving the property dispute between themselves and Rust, the plaintiffs filed this lawsuit against the City. They assert that, by issuing the building permit to Rust, the City "took Plaintiffs' easement." (*Id.* ¶ 88.) Based on that alleged taking and the damages they incurred as a result, they assert claims for (1) "Violation of 42 U.S.C. § 1983 by Unlawful Taking" (Compl. Count I), based on the City's policy of "inadequate training of code-enforcement officials" and "policy of erring in favor of permits and against property rights" that "reflect and amount to deliberate indifference to the rights of persons with whom the policies come into contact" (*id.* ¶¶ 127, 129); (2) unlawful taking in violation of the Fifth and Fourteenth Amendments, "irrespective" of whether the City violated § 1983 (*id.* ¶ 154); (3) a declaratory judgment that "the permit constitutes an unlawful taking in violation of the Fifth and Fourteenth Amendments" (*id.* ¶ 159); and (4) inverse condemnation in violation of state law, Tenn. Code Ann. § 29-16-123.

---

[3] In support of its original Motion for Judgment, the City stated that it did "not contest" for purposes of its motion that the BZA is a final decision-making authority with respect to issuance of the building permit (Doc. No. 14 at 19), and the City did not argue that the plaintiffs' takings claim is unripe based on the absence of a final decision (*see generally id.* at 10–19). However, in itsSupplemental Motion for Judgment on the Pleadings," the City argues for the first time (in the alternative) that the BZA did not issue a final ruling denying the plaintiffs' appeal and, therefore, that the plaintiffs' Fifth Amendment claims are unripe. (Doc. No. 39 at 1–2.)

"A regulatory-takings claim is not ripe until after 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" *McCausland v. Charter Twp. of Canton*, No. 23-1479, 2024 WL 3045525, at *6 (6th Cir. June 18, 2024) (quoting *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott*, 588 U.S. 180 (2019)). The court finds that, at a minimum, the plaintiffs have adequately alleged that, "as a practical matter, the Board ratified issuance of the permit" or, alternatively, that the zoning official who issued the permit was the "final policymaker concerning permits in this context." (Compl. ¶¶ 143, 146.) The plaintiffs' taking claims are ripe.

The City filed an Answer to the Complaint and, shortly thereafter, its Motion for Judgment on the Pleadings and supporting Memorandum. (Doc. Nos. 13, 14.) The plaintiffs filed a Response; the City filed a Reply; and the plaintiffs, with permission, filed a Sur-reply. (Doc. Nos. 16, 17, 24.) After briefing on the defendant's motion was complete, the plaintiffs filed their own Revised Motion for Partial Judgment on the Pleadings and supporting Memorandum.[4] (Doc. Nos. 35, 36.) That motion, too, has been fully briefed, with a Response and a Reply. (Doc. Nos. 38, 40.)

The City then filed its Supplemental Motion, raising a new ripeness argument (Doc. No. 39), to which the plaintiffs responded (Doc. No. 41), and the City filed a Reply (Doc. No 46). As noted above, the court rejects this argument with little discussion. (*See* Note 3, *supra*.)

## III. DISCUSSION

### A. The City's Motion

The City's Motion for Judgment argues, in a nutshell, that the Complaint fails to state a constitutional violation. More specifically, it argues that the City's issuance of a building permit to Rust did not constitute an adjudication of the dispute between the plaintiffs and Rust regarding the validity of the driveway easement or a "taking" under the Fifth Amendment, for purposes of Counts 1 and 2 of the Complaint, and as a result of which the plaintiffs' request for a declaration that a taking occurred and their state law inverse condemnation claim also fail. The City also argues that the Complaint does not allege a "taking" for a public purpose, that the city zoning employee who issued the permit was not a final policymaker for the City, and that the inverse condemnation

---

[4] The plaintiffs filed an initial Motion for Partial Judgment on the Pleadings, in partial response to which the City sought, and was eventually granted leave, to amend its Answer. (*See* Am. Answer, Doc. No. 34.) Following the filing of the Amended Answer, the plaintiffs filed their Revised Motion for Judgment on the Pleadings, which superseded the first. That is the motion now pending.

claim fails for the alternative reason that such a claim requires intentional rather than negligent acts resulting in damage to the plaintiff's real property rights. (*See generally* Doc. No. 14.)

The plaintiffs' Response insists that a government-issued permit authorizing a third party to build a fence down the middle of a shared driveway, cutting off the plaintiffs' access to that portion of the driveway over which they had an easement, constituted a "government-authorized invasion of property" and, therefore, a taking that required compensation. (Doc. No. 16 at 2.) They also point out that the City's argument that no taking could have occurred because there was no public use is simply wrong as a matter of law, and they argue that Tennessee now provides a cause of action against a government entity that "accidentally or negligently causes substantial property damage." Tenn. Code Ann. § 29-16-201.

The City's Reply maintains that its opening Memorandum did not argue that a takings claim requires a showing that the taking was for a public purpose; it apparently concedes that a government appropriate for private use is a taking. It argues that its intended point was that "the lack of a public use is a circumstance that cuts against the argument that a taking occurred here."[5] (Doc. No. 17 at 3.) The Reply also points out the extent to which the question of whether a valid easement existed at the time Rust obtained the building permit was a complex and not readily resolvable legal dispute. The plaintiffs' Sur-reply characterizes the City's Reply as disputing the existence of an easement or as arguing "at least that the absence of a prior judicial declaration of the easement's existence precludes the finding of a taking." (Doc. No. 24 at 1.) They argue that property rights do not stem from court decisions but that courts, instead, simply "determine[]

[5] To put it charitably, the City's Response did not make this position clear. (*See, e.g.*, Doc. No. 14 at 13 n.10 ("The public use or purpose criterion of a Fifth Amendment 'taking' claim was . . . not at issue in *Bruneau*, *as it is here*." (emphasis added) (citing *Bruneau v. Mich. Dep't of Env't*, 104 F.4th 972 (6th Cir. 2024))).)

rights." (*Id.*) And both parties contest the other's failure to present caselaw supporting their respective positions.

As to the plaintiffs' last point, the City's Reply clearly does not argue either that an easement does not exist or that courts create property rights. The City's obvious point is that the existence of an easement, as of November 2024 or January 2025, was disputed and not at all obvious. As the plaintiffs acknowledge, courts determine the existence of property rights. Due to Rust's actions, court resolution of the existence of an easement was required. The plaintiffs sought such resolution and ultimately won.

Second, while its opening Memorandum did not make the point clear, the City's Reply concedes that a government taking for a private purpose is altogether prohibited. The court has no need to address this issue.

Otherwise, as discussed below, the court finds that the City's action did not constitute a taking. Because this finding is dispositive of all of the plaintiffs' claims, the court does not reach the parties' other arguments.

**B. Takings Law**

"The Takings Clause of the Fifth Amendment prohibits taking 'private property . . . for public use, without just compensation.'" *Puckett v. Lexington-Fayette Urban Cnty. Gov't*, 833 F.3d 590, 609 (6th Cir. 2016) (quoting U.S. Const. amend. V). In addition, "[p]rivate-use takings, rare as they may be, are unconstitutional regardless of whether just compensation is paid." *Montgomery v. Carter Cnty.*, 226 F.3d 758, 766 (6th Cir. 2000) (citing *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984)). The Sixth Circuit recognizes a two-part test for takings claims. "First, the court must examine whether the claimant has established a cognizable property interest . . . ." *Puckett*, 833 F.3d at 609 (internal quotation marks and citation omitted). "Second, where a

cognizable property interest is implicated, the court must consider whether a taking occurred." *Id.* (internal quotation marks and citation omitted).

There is "no question that the Government's destruction of [an] easement would ordinarily constitute a taking of property within the meaning of the Fifth Amendment." *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 627 (1961). And in this case, the City does not dispute that, at the time the fence building permit was issued to Rust, the plaintiffs had a cognizable property interest—an easement granting them access to the entirety of the driveway between the Properties—that was adversely affected by Rust's building a fence down the middle of the driveway.

In other words, only the second step of the takings analysis is before the court. The question that is entirely dispositive of the plaintiffs' claims is whether the City's issuance of a building permit to Rust constituted a taking by the City.

**C. Whether a Taking Occurred**

In the classic taking, the government appropriates or invades private property. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (citing *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951); *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945)); *see also Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) ("The Court's physical takings jurisprudence is 'as old as the Republic.'" (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002)); *King v. United States*, 151 F.4th 1348, 1359 (Fed. Cir. 2025) ("A physical occupation or appropriation of property by the government for itself (or by transferring the property interest to a third party) is the paradigmatic taking and is 'assess[ed] . . . using a simple, *per se* rule: The government must pay for what it takes.'" (quoting *Cedar Point*, 594 U.S. at 148)), *cert. denied*, 146 S. Ct. 2688 (2026).

Even without a direct physical taking, a government entity can accomplish much the same thing through "regulation of private property . . . so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537 (citing *Penn. Coal Co. v. Mahon*, 260 U.S. 393 (1922)). The Supreme Court has identified two kinds of regulatory actions that amount to categorical or *per se* takings. The first is "where government requires an owner to suffer a permanent physical invasion of her property," *id.* at 538 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)), and the second is where regulations "completely deprive an owner of '*all* economically beneficial us[e]' of her property," *id.* (emphasis in original) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). Otherwise, "regulatory takings challenges are governed by the standards set forth in *Penn Central*." *Id.* (citing *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978)); *see also, e.g.*, *Tahoe-Sierra Pres. Council*, 535 U.S. at 322 (*Penn Central* is "characterized by 'essentially *ad hoc*, factual inquiries' designed to allow 'careful examination and weighing of all the relevant circumstances'" (internal citations and quotation marks omitted)).

The plaintiffs maintain that the issuance of the building permit was a "*per se* unlawful taking of [their] easement" (Compl. at 28), essentially because it constituted a "wholesale destruction of an ingress-egress easement" (Doc. No. 16 at 9). In support of its position that no taking occurred, the City cites, primarily, *Sheetz v. County of El Dorado*, 601 U.S. 267 (2024), and *Bruneau v. Michigan Department of Environment*, 104 F.4th 972 (6th Cir. 2024), while also arguing that the cases on which the plaintiffs rely are not on point.[6]

[6] In *Sheetz*, the Court held that the "Takings Clause does not distinguish between legislative and administrative permit conditions" and that the test established in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994), applies to both legislative and administrative permit conditions. *Sheetz*, 601 U.S. at 270. In *Bruneau*, the Sixth Circuit observed that "[t]he duration and character of a government's appropriation of

The plaintiffs rely on *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021), for the proposition that "[g]overnment-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation." (Doc. No. 16 at 1 (quoting *Cedar Point*, 594 U.S. at 152)).) They insist that this is exactly "what happened here" when the City "authorized" Mary Rust to take the plaintiffs' easement. (*Id.*) Citing *Loretto v. Teleprompter Manhattan CATV Corp.*, they argue that it has long been established that "the government may not evade the Fifth Amendment's prohibition on uncompensated takings by delegating the right to seize property to a private party rather than exercising it itself." (*Id.* at 9–10.) Citing *Russell & Elizabeth Reid Family Trust v. United States*, 178 Fed. Cl. 417, 429–30 (2025), the plaintiffs assert that a government clearly effects a "'physical,' or '*per se*,' rather than a 'regulatory,' taking when it deprives a property owner of an easement." (*Id.* at 11.) Finally, citing *King v. United States*, 159 Fed. Cl. 450, 486 (2022) (which itself relied on *Cedar Point* and *Loretto*), the plaintiffs assert that courts have held that a government's authorizing a third party to intrude on private property may give rise to a taking, even if the "third party had a choice in how to act toward the plaintiff." (*Id.*) The court finds that neither party has pointed to any caselaw remotely on point and controlling of the outcome in this case—or even helpful.

In this case, when the City issued the building permit, Rust had presented her application with a Deed of Correction that purported to negate the existence of an easement, but the City allegedly also knew that the plaintiffs maintained that a valid easement existed and that the Deed of Correction could not unilaterally terminate the easement. The City, as alleged by the plaintiffs,

property, or intrusion on it, determine whether it amounts to a taking" and that a "government's negligent infliction of injury on property does not by itself a taking make." *Bruneau*, 104 F.4th at 975, 976 (citations omitted). Neither opinion has much to say about this case, though *Bruneau* arguably provides some minimal guidance as to how to determine whether the government action in this case constitutes a taking.

made it clear that it would not and could not resolve the property dispute regarding the existence of an easement. Instead, the City, apparently in reliance on the Deed of Correction and despite knowledge of the dispute, found that Rust had satisfied the requirements necessary for issuance of a building permit. Rust herself clearly knew that the existence of a valid easement was in dispute. In fact, according to the plaintiffs, Rust actually knew that a valid easement existed but persisted in her pursuit of a building permit and built a fence in derogation of the plaintiffs' rights to the easement.

Here, the City issued a building permit based on Rust's technical compliance with the requirements for obtaining such a permit. In doing so, the City did not purport to resolve the question of whether an easement existed in Rust's favor, and it acknowledged that the plaintiffs, at the time of the BZA appeal at least, were already pursuing a quiet title action against Rust to resolve that question.

The plaintiffs, in fact, expressly allege that the City zoning official who issued the permit described himself as "'compelled' to grant permits in the absence of an affirmative obstacle to their issuance"; that the BZA's members "opined that the Board lacked the power to resolve disputes over citizens' property rights" and, more specifically, could not "determine whether the Plaintiffs possessed an easement"; that the City's Code of Ordinances expressly provides that the zoning ordinances under which permits are issued "are not intended to abrogate any easement"; and that even the City Attorney was "ignorant of Tennessee easement law." (Compl. ¶¶ 91, 96, 125, 138, 141.) The plaintiffs' position, essentially, is that the City was negligent in not training its staff better and that, at a minimum, it should have erred on the side of caution, denying the permit until the underlying property dispute was resolved.

Under these circumstances, the court finds that the issuance of a permit did not constitute a taking. The permit authorized the building of a fence without resolving—or even purporting to resolve—the issue of whether, in fact, Rust had clear title to the land on which the fence was to be built. On the facts, the case is distinguishable from all of the cases on which the plaintiffs (and the defendant) rely. In *Loretto*, the Court held that a regulation authorizing cable companies to install cables on a landlord's property—a "minor but permanent physical occupation"—without the landlord's permission or right to exclude constituted a physical "taking" for which compensation was required. 458 U.S.at 421; *see also id.* at 426 ("We conclude that a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve."). *Loretto* "stands for the proposition that the government may not require (without providing for just compensation) a property owner to grant access to a third party so that the third party can permanently occupy the owner's premises." *Cable Holdings of Georgia, Inc. v. McNeil Real Est. Fund VI, Ltd.*, 953 F.2d 600, 604 (11th Cir. 1992). In *Loretto*, however, there was no dispute that the plaintiff landlord owned the property on which the cable company installed its facilities, that the government authorized the permanent installation over the owners' objection, and that no compensation was paid.

Similarly, in *Cedar Point*, the Court held that a "California regulation [that] grant[ed] labor organizations a 'right to take access' to an agricultural employer's property in order to solicit support for unionization," "for up to three hours per day, 120 days per year," "constitute[d] a *per se* physical taking under the Fifth and Fourteenth Amendments." *Cedar Point*, 594 U.S. at 143–44. Specifically, the Court noted that the regulation at issue "appropriate[d] for the enjoyment of third parties the owners' right to exclude"—one of the "most treasured" rights of property ownership. *Id.* at 149.

Neither of these cases provides guidance here, where the City, in granting the building permit on what, according to the Deed of Correction, appeared to be Rust's property, did not intend to "abrogate any easement" or to resolve the question of whether an easement, in fact, existed. Instead, *Mary Rust*, by building a fence on the property covered by a valid easement, intentionally interfered with the easement and impeded the plaintiffs' access to it. Rust's decision to construct a fence, knowing that an easement existed, caused the plaintiffs' damages, not the issuance of the building permit. Rust, not the City, attempted to appropriate a right appurtenant to the plaintiffs' enjoyment of their easement.

Imagine, hypothetically, that *Loretto* involved a situation in which a cable company sought to install cable facilities on the exterior of several apartment buildings but, instead of being authorized by a state statute to make these installations, entered into separate contracts with the building owners authorizing it to do so[7] and then sought the necessary building permit from the local zoning authority. And then imagine that, while the building permit application was under consideration, one of the building owners informed the zoning authority that, in his view, the contract pertaining to his building was not valid because his son had signed it without his permission, or his lawyer signed it without negotiating the rate he thought he had agreed on, or the cable company forged it, and the cable company, moreover, knew the contract was invalid. But the zoning authority issued the building permit anyway, finding that the contract presented by the cable company appeared on its face to be valid and that, by submitting that contract along with other documentation, the cable company had effectively checked all the boxes necessary for a building permit. Would this be a taking? Even assuming that the contract was invalid, the court

[7] Prior to the enactment of the law at issue in *Loretto*, the cable company defendant had, in fact, reached contractual arrangements with building owners for the placement of its facilities on the exterior of the buildings. *See Loretto*, 458 U.S. at 421–23.

finds that this would not be a taking. The Fifth Amendment "governs the taking of property by the government, not property disputes between private citizens." *Sawchyn v. City of Brunswick*, 121 F.3d 709 (Table), 1997 WL 461306, at *1 (6th Cir. Aug. 12, 1997). In this hypothetical, the building owner would have a claim against the cable company for recission or nullification of the contract and damages—just as the McDonalds had quiet title and damages claims against Rust.

In short, a building permit, *per se*, "does not give a builder the authority to begin construction on property belonging to a third party; rather, the builder must secure the third party's permission." *Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 200 (9th Cir. 2013); *see also Green v. Cowell*, No. 5:25-CV-00514-BO-KS, 2026 WL 1894811, at *3 (E.D.N.C. July 1, 2026) ("The issuance of a facially lawful building permit to a private third party does not, without more, create a constitutional violation by the municipality issuing the permit."). In this case, the onus was on Rust to obtain the plaintiffs' permission to build the fence, knowing that the plaintiffs owned a property interest in the driveway easement, irrespective of the issuance of a building permit. Moreover, even assuming that the City was negligent in issuing the building permit before the easement dispute was resolved and could—or even should—have withheld the permit until the easement dispute was resolved, "the Constitution does not entitle private parties to accurate enforcement of local, state, or federal law." *Billie v. Vill. of Channahon*, 58 F.4th 905, 906 (7th Cir. 2023) (citations omitted).

The plaintiffs, in sum, own an undisputed easement on the portion of the driveway on Rust's property, and they owned that easement at the time the building permit was issued to Rust, irrespective of Rust's actions. Contrary to the plaintiffs' (legal) assertions, however, the building permit, issued with knowledge of a dispute regarding the existence of an easement, did not abrogate or purport to abrogate, take, or terminate the easement; nor did it bestow property rights

on Rust. It did not authorize Rust to "seiz[e] . . . Plaintiffs' easement and a portion of their yard." (Compl. ¶ 162.) It simply authorized Rust to build a fence. Her decision to build a fence that violated the plaintiffs' property interests is on Rust, not the City.

Because the plaintiffs cannot establish a taking by a government entity, the City is entitled to judgment as a matter of law on all of the plaintiffs' claims for relief, and the plaintiffs are not entitled to judgment on any of their claims.

## IV. CONCLUSION

For the reasons set forth herein, the defendant's Motion for Judgment on the Pleadings (Doc. No. 13) will be granted, and the plaintiffs' Revised Motion for Partial Judgment on the Pleadings (Doc. No. 35) will be denied. The defendant's belated Supplemental Motion (Doc. No. 39) will be denied as moot. This case will be dismissed in its entirety.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge